Do you have any water bills? Oh, here. Oh, is it up here? I guess so. Is this here? I don't sometimes trust these. You don't know how long it's been up here. Well, water doesn't go up there. Well, I... Okay, never mind. Yes, thank you. Next is Flemming. No, I have one. My first name is Flemming. Yeah, I have one. December. December is Flemming. If you can. Okay, we will now hear counsel. Mr. Meade. Good morning, Your Honors. Good morning. For the record, my name is Joe Meade, and I appear here on behalf of Apland, George Flemming. The Apland Reserve, five minutes for rebuttal. Yes, that's granted. Your Honor, the Apland has heard several issues in this appeal. He contends that the conviction of the government failed to present even construing the facts in the light most favorable to the government any evidence which a rational finder of fact would find that he engaged in wire fraud, which is count two to 18 of the indictment, program fraud, count 26 to 32 of the indictment, or conspiracy to commit program fraud and wire fraud, count one of the indictment. Your Honor, the facts as due to trial was that in 1998, George Flemming, who owns a company called G-Maintenance, successfully bidded for a contract to renovate 50 units belonging to the Persians Housing Authority. Subsequently, the contract was renewed to do an additional 100 units. For the total package, both contracts, he received approximately $1.4 million. The government contends that Mr. Flemming, engaging on his fraud by dispersing seven checks to an employee of the Housing Authority named Walter John, among other things, to expedite the payment for work that had been done and had been verified. We contend that there was no substantial evidence that the payment to Mr. John was intended to influence him to do anything other than what he was authorized to do. If the payment were to expedite, if the payment to Mr. John were to expedite the proceeding through the paperwork so that he would be paid earlier than other people were paid, because I gather payment takes a long time, is it your argument that that would not be affecting his honest services, which is the definition? I would concede that the facts which Your Honor just gave, a juror could make a finding that the payment was intended to influence Mr. John's honest service, but that didn't happen in this case. But weren't there two female witnesses who testified that when they took over or substituted, that that was what they understood? There were two witnesses. Yes, Your Honor. Two lady witnesses. If I may, yes. There was Ms. Felix and there was Ms. Christopher. Ms. Felix testified that she was an accountant with the Virgin Islands Housing Authority and she received approximately $600 from Mr. Fleming as a donation to her baseball team. As a matter of fact, she testified that it was the practice of Virgin Islands Housing Authority's employees to ask vendors of the Virgin Islands Housing Authority for donation for the baseball team and other teams, and they did not realize that that may appear to be improper until some official from HUD had a meeting and indicated to them that this was not, that they should not even ask for donation. There was no testimony that Ms. Felix was paid to expedite any checks for Mr. G. How about Christopher? Christopher testified that in 1999, for approximately three months, she substituted as an accountant, and during those three months, she received packages from Mr. John with invoices for G Construction, Mr. Fleming's company, and Mr. John contacted her telephonically and requested that she expedite payments, and after she did that, she was paid $250. But doesn't that show that the jury could find that he was paying government people to expedite? No, it would have been a quantum leap in logic from A to Z for the jury to do that. It would be speculative. How about Paris' testimony? Paris' testimony was that after he interviewed Mr. Fleming, Mr. Fleming indicated that Mr. Fleming and Mr. John had entered into an agreement where Mr. Fleming would pay Mr. John $500 for every unit completed. That doesn't even make sense in the context of the whole situation because... Well, when you put Christopher and Paris together, couldn't a jury infer from that testimony that Fleming paid John to expedite payments? No, Your Honor, and I'll tell you why. When you look at the evidence that the government introduced, it showed payments from about 1998 to 1999. So, I mean, checks that were disbursed from Mr. Fleming to Mr. John. So that seems very consistent with Mr. Fleming's contention that it was a loan that he gave to Mr. John and that pursuant to the loan agreement... But the jury didn't have to believe that. Pardon me? The jury didn't have to believe that it was a loan. Yes, Your Honor, but the evidence must be logical and convincing. It must make sense. And to just opine that because Ms. Christopher testified that in three months in 1999, she expedited checks, there was no evidence presented by the government who has the burden, the number of checks that she expedited in the three-month period, or the time frame in 1999 when she expedited those checks. But if the jury believed that she expedited those checks, we believe the evidence of record, there's no substantial evidence that they could find that, in fact, all of the checks, the checks that Mr. Fleming received pursuant to the legitimate work he did, all the checks that were given to Mr. John was a result of any attempt by Mr. Fleming to influence Mr. John into doing something that he ought not to have done. I mean, there's simply no evidence. Ms. Felix... Why was he paying him all this money, then? Pursuant to a loan, Judge. He was... Mr. John... Well, I understand that was the defense, but he was interviewed by Paris, and he did not say it was a loan... Oh, yes, he did say it was a loan. ...until several interviews down the road, right? No, he did say it. When he was initially approached by Mr. Paris, Mr. Paris told him that he was investigating fraud by other Virgin Islands Authority employees. And then Mr. Fleming says, well, I don't know about any other employees. I know about me. And as a matter of fact, I know one employee that I've given a loan because he indicated to me that a family member was sick. And I disbursed money to him in checks so that I can have a record because they wanted my money back. And I was giving him this money because I felt bad because he told me he was sick. I know what it's like to be sick. And he indicated to me that he didn't have any money. Well, not he was sick. A family member was sick. And he didn't have any money to, I guess, pay for the medical treatment for the family member. And I believe when you look at the overall evidence, it is consistent or the defense that it was a loan seems more consistent than it was a payoff to do anything. Ms. Felix and cross-examination, no, I'm sorry, Ms. Christopher, testified that she was never contacted by Mr. Fleming. She had no indication, direct or indirectly, that Mr. Fleming had given Mr. John any money to ask her to expedite payment. As a matter of fact, there was no evidence that he even requested that Mr. John expedited our asks that payments be expedited. Can I ask, can I take your warning? I'm sorry, Judge Nichols. Go ahead. Did his, did Mr. John's responsibilities not put him in a position to determine the order in which invoices would be submitted for payment to the person who was writing the checks for the invoices? Perhaps it was, but there was no evidence of record. Mr. John was a part of the procurement office of the Housing Authority. And part of his official job activity was to, after an invoice comes in from a contractor, after it has been verified by the requesting agency of the Housing Authority that the work had been done, his job was to forward the invoice to St. Thomas. The St. Thomas office would then do the payment. So if the evidence comes out that Mr. John visited the procurement office to request payment, there was nothing unusual about that, because other vendors did that. And there was evidence that he also talked to Ms. Robo, who is the supervisor of Mr. John. Can I ask you a question? I know the red light is on, but I tried. You argue that the district court erroneously excluded a promissory note that you say would have supported the position that Fleming was paying back the money that John had lent him. The district court held it was inadmissible hearsay. Yes, it did. And I'm interested, what is the basis, what is the rule under which you think the note could have or should have been admitted? Well, it could have been admitted under Rule 807, the residual exception to the hearsay rule, because remember, the defense was that I gave the money as a loan. The promissory note was relevant to the material fact that the money was given as a loan. But the government says that the note was prepared by a third party. I don't know who, and I was going to ask the government, but by whom and why? It was prepared by Mr. John, the person who got the money. I'm not sure that's the government's position, but we'll find out. It is. As a matter of fact, in the supplemental appendix that the government provided, I believe that the note is contained. Signed by Mr. John and notarized by Mr. John. It's an inartfully drafted note. However, these people were not lawyers, so even lawyers draft inartfully drafted notes. But that was very relevant to show that, in fact, it was a note. We'll get you back on the broadcast. The red light is on. Thank you. Denise. You are not Denise. I'm not Denise. You're Jason Cohen. Yes, good morning, Your Honors. You don't look like Denise. My name is Jason Cohen. I'm an assistant United States attorney in the District of the Virgin Islands, and I represent the United States, the FLE in this case. There were several arguments presented. May I just ask you, do you concede that there was no proof that the object of the payments were to get reimbursement that exceeded the average cost to repair the apartments? Yes, I concede that. That was originally part of the claim, and that's no longer in the case? Yes. It's just the expedition, the honest services to the people of the Virgin Islands by paying to get his claim expedited. That's correct. Now, who gets hurt by that? Do the people of the Virgin Islands get hurt if they move this ahead? I mean, you're not claiming that he wasn't entitled to them, or are you, the 500 dollars? No, we're not arguing that he, there was no evidence that was presented that would show that he was not entitled to it. I'm not arguing that he was. So what's the harm? So what happened that was so terrible? Your Honor, I guess my first point would be the statute doesn't require that there be that kind of harm, but the point... Well, he's been in jail for years. Do you want to pull that microphone down in front of you, please, sir? Okay, thank you. I believe that, I mean, I think the... He's been in jail for years. We'll get to the sentence later, but... I think we can infer that the other people waiting for their money that were pushed back, whereas he was moved ahead and expedited... Did you put in evidence of that? No, Your Honor. What was the, let me put the question a little bit differently. What was the responsibility, what were the job responsibilities that you claim didn't receive honest services as a result of these payments? What was his responsibility that you think was influenced by this? I believe the testimony was that Mr. John's responsibility was to receive the invoices from the contractors after they were verified. He would produce what was called a receiving report which he would then send over to the St. Croix office and that would have to be processed and then payment could be sent to the contractor. St. Croix office? I'm sorry, he would send it from St. Croix to St. Thomas. We do read the record. So his... I misspoke, I apologize. Among his responsibilities, he controlled the order in which invoices were submitted for payment. Is that what you're telling me? The invoices had to come through him so essentially he was sort of a bottleneck there. He was sort of the guy at the bridge. He'd have to allow them to go through or not. So yeah, he did control the order. What shows that he had a specific intent to deprive the citizenry of honest services of John if he was only asking John to do his job? I believe the payments were certainly... I mean, he paid a significant amount of money. We have the checks that were paid as well as notations of cash that were paid to John that were more money than he received in a year. He was receiving in excess of that from Mr. Fleming. We have... And we see that Mr. John didn't just take that money and process the payments. He also contacted the accounts clerks on behalf of Mr. Fleming and would make repeated calls. The account... I believe Ms. Christopher testified and called so many times to expedite the payments that she would... It was annoying. She didn't want to take his phone calls anymore. He also sent cash to her and then she would move the payments. So you're saying, in effect, these payments created a conflict of interest and the public interest may well have called, in some instances, for a different order of payment than Mr. Fleming first. Well, I think the public interest requires... calls for the government employees to just do their job honestly in the way they're... in accordance with the rules and regulations of the agency. Your answer to Judge Stapleton was yes. So, yes. And serve one master, the United States, the Virgin Islands government. Where would we be if everybody started doing this? And if the word got out, when you're going to do work there, unless you're willing to pay the expedite, it's going to take forever to get paid. That could have an effect. Absolutely. I have a question about the money, though. Apparently, at least the argument is, that Mr. Fleming paid Mr. John $500 per unit. But there were 150 units, and the total amount paid to John in the period of issue was $37,000. I'm not the greatest mathematician, but 150 times 500 is more than $37,000. Where am I going wrong? Your Honor, that's... the government was able to present proof of $37,000 in payments. I understand that it doesn't exactly add up to $500 per unit, but I don't think that detracts from the fact that there was an agreement for a payment, and whether or not other money was paid that we're not aware of, or whether or not he didn't actually pay up all the money that he agreed to pay, does not take away from the fact that he was paying him money corruptly. I have a question on the sentence. If my colleagues don't mind if I jump to that. The district court... Mr. Fleming challenges a 24-month sentence, and the guideline range was 15 to 21 months. The district court, as far as I can tell, didn't discuss any of the Section 3553 factors in this sentence. He merely said the sentence reflects the seriousness of Fleming's crime and the lack of a deterrent to such criminal conduct. Didn't the district court have to give more specific reasons for going above the guideline? Your Honor... I mean, I think we have a series of cases that say that, relatively recently. I think in this case, Your Honor, the district court actually did... I mean, I thought the discussion of the 3553 factors was actually fairly extensive, where the judge acknowledged all the different factors, said that he had considered them, and then he focused on the factors that he thought were most important to this case and that influenced his decision here to vary the sentence upward slightly. And he focused on the seriousness of the offense, deterrence to others to commit such serious criminal conduct. He said those two things. Did he say anything else? I mean, a lot of 3553 factors, we have said you don't have to... the district court doesn't have to specify each one, but... Your Honor, he also said to promote respect for the law, I believe, and he also... and when in describing his feelings about the case, I know the judge emphasized the impact that these type of corruption charges can have on the community of the Virgin Islands and how important it is to set an example and to deter such conduct for the future. And I think the judge went into that in several paragraphs in the transcript. Thank you. I don't intend to stop your argument. Thank you for that point. Thank you, Your Honor. A promissory note. Yes, I'd like to address that since you brought it up. The... I guess the issue of Rule 807 certainly was not brought up in any of the briefs, and I would submit that since it was not raised by the appellant that it was waived. But I think the judge definitely found that it was hearsay, and in this case, we submitted, I believe, at the court's request, I think it was left out of the original brief, but we submitted an SA-2, a document marked SA-2, which was the purported loan agreement that was signed by Walter John. Walter John was not a witness in the case. He was... Yeah, there was no one that was brought forward to authenticate the document. How about the testimony? There was testimony about the existence of the... and it wasn't there, as I recall, and then on the redirect from Fleming about the agreement, the court wouldn't allow that. Remember that? The court said there wasn't direct on that. I think the judge may have been under misapprehension. Yes, Your Honor, I believe that was around 615 or so on the joint appendix. I believe even if the judge may have misspoken or misunderstood what the cross questions were, that it was certainly harmless error in this case since the defendant, the appellant, was able to testify about the written agreement anyway... On direct, yeah. On direct and on cross in one or two questions where he would bring it up as an extra in his response on cross and say that he had a written agreement. So it was before the jury. It was argued during opening and closing to the jury, at least, that there wasn't a loan agreement. Any kind of harm that could have accrued from improperly not admitting the document was certainly harmless. Could you answer the question that I'm missing? When you argue that the note in your brief was prepared by a third party, right? Yes, Your Honor. And who prepared it and why would somebody prepare it? It appears to have been prepared... I mean, what was your position, or what's in evidence? It's a document. It looks like it was never admitted into evidence, but it was attached... Well, it wasn't admitted into evidence because the court held it was an admissible hearsay. Yes, Your Honor. And the question is, is it an admissible... The question should be, was it an admissible document or did the court err in holding that it couldn't be admitted? That's the point, the bottom line. And you say the court was right, it was written by a third party. Who's the third party? The third party is Walter John, the co-conspirator. Is he a third party? Well, he was not... The cases against Fleming and John were separated and tried separately. This was a case just against George Fleming. Walter John was not a party to the case. But isn't it essential? I'm sorry. I mean, it's not... It isn't a note, is it? And it isn't an agreement. It's a statement by John that, quote, I have borrowed $37,000 from so-and-so in 1998 and 99. That's not an agreement. That's not a promise to pay. He's setting forth a fact that, in the past, I have borrowed $37,000. And the district judge thought that was being offered for the purpose of showing that he borrowed $37,000, which sort of sounds like hearsay, doesn't it? I think it absolutely is hearsay, Your Honor. It's a statement by a third party offered for the truth of the statement. And that party was not available for cross-examination with regard to the statement or the document. Okay. And I would just... And as I said before, if the door was opened or the judge somehow heard in not admitting it, it was harmless error anyway. Okay. Your Honor, my time is almost up, but I know the appellant focused almost exclusively on sufficiency of the evidence, so I feel like I should at least address that a little bit. I know we focused on it extensively in our brief. I would just add that I think the evidence here is certainly sufficient for a rational juror to find that the defendant was guilty. I know you're familiar with the burden, but I think in this case, you had the statement that Paris testified that Fleming stated that there was an agreement. Then you had the payments made by John up to Miss Christopher, the accounts clerk. You had also had Fleming giving the, quote, donation, whatever you want to call it, was a payment to Miss Felix in order that she would also expedite payments to him. Well, wait a minute. There wasn't anything in the record that Fleming had anything to do with that, was there? Yes, the testimony, Your Honor, was by Miss Felix. She testified that she had given her bank account number, actually, to Mr. Fleming. Fleming would then put money into her bank account and say that it was a donation for her baseball team. She testified that she was very passionate about baseball. This is what she did every day. So the way to get her to do something for him, like expedite the payments, was to make a donation to her baseball team. I mean, whatever way you call it, you call a duck a dog, it's still a duck. But that's certainly evident. The jury could decide whether to believe Fleming or Harris. It's a matter of credibility, Your Honor, and in this case the jury made the decision to discredit the testimony of Fleming and the defense that he pushed, that it was a loan, and they believed that it was actually a corrupt payment to influence a government official. Thank you very much. Thank you, Your Honors. Mr. Means. Your butler. Yes, Your Honor. Your Honor, let me start with the sentencing. I believe that you asked about the 3553 factors, and the judge read there's a conspicuous absence of evidence that the judge adhered to this quotation in the United States v. Cooper. Yeah, but we said in Super that it's not necessary in subsequent cases. You don't have to mention each one, but it has to be evidence that you considered. Yes, and there was a conspicuous absence of evidence that the judge considered all of the factors. The only factor that he considered, and I respectfully direct your attention to Joint Appendix 646 to 647, the only thing he said is that I must fashion this sentence that is sufficient but no greater than necessary. And then he goes on and he quotes the statute, and then he says this is a serious crime. You've committed a serious crime. And then he said I must sentence you, I must commit you to the Bureau of Correction for 24 months. Well, he did say that the sentence reflects the seriousness of the crime and will act as a deterrent to such criminal conduct. And will promote respect for the law. That's 646, right? Yes. That's it, but that's nothing more. Yeah, but there are other factors. Those are Section 3553A factors. Yes, some of the factors. Okay. So we know that he considered the factors and he considered three of them to be important in this case. He just means that they were important and then sentenced him, a jump, in three months. But if I may, I'd like to... He's in jail now, he's not at home. No, he's in jail. If I may, I'd like to go back to the sufficiency of the evidence argument. The court inquired from the government about the expeditious payment or the expediting of payment. The government presented no evidence as to the time frame in which a contractor is paid or then is paid on the rules and regulations of the Virginians Housing Authority. So there was no evidence as to whether one can conclude that a payment had been expedited because it falls well within the time frame that is allowed by the procedures of the Virginians Housing Authority. Now, the court also asked about whether Ms. Christopher was influenced to expedite payment over other vendors. There was no evidence that there were any other vendors. Counselor for the government asked a leading question, and there were other vendors, right, who didn't get paid, and she said yes. That was the extent. There was no naming of the vendors, the number of vendors, the time in which these vendors should have been paid, nothing whatsoever. And again, we go back to our original argument. There was no evidence or evidence from which an inference could be made that Mr. Fleming knew anything about what Mr. Christopher or Mr. John was doing or that he paid him to influence him to do anything. Remember, the evidence was that the payment started since 1998, way before Ms. Christopher testified that she expedited payments in a three-month time period. And again, Ms. Felix never testified that she expedited any payment because of any donation by Mr. Fleming. She specifically testified that she, as well as other Virgin Islands Housing Authority employees, importuned vendors and contractors to give donations to the baseball team, not in an effort to expedite any payment. So there's no evidence that Ms. Felix testified that Mr. Fleming gave her the donation in an effort for her to expedite any payment. And for the government to argue that is disingenuous. There's no evidence or record of that. Yes. Any questions? Okay, thank you very much. We will take this case under advisement. I will declare the sitting closed. And once again, thank the members of the Virgin Island Bar for the courtesy they have shown us throughout the session. Thank you. Thank you. Maybe you better say everybody's excused for a better day. These people know. When's the next hearing? Tomorrow?